# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| MELISSA GARDNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-cv-1007 |
| | ) | |
| AMERITECH SICKNESS AND | ) | |
| ACCIDENT DISABILITY PLAN and | ) | |
| AMERITECH LONG TERM | ) | |
| DISABILITY  PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

## O P I N I O N   &   O R D E R

The plaintiff, Melissa Gardner, has brought this civil action, pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), codified at 29 U.S.C. § 1132(a)(1)(B), to recover benefits from short-term and long-term disability benefits plans established by her former employer. Gardner and the defendants, Ameritech Sickness & Accident Disability Plan and Ameritech Long Term Disability Plan (referred to collectively as "Plans" or "Defendants") have cross-filed for summary judgment (Docs. 19, 25).[1]  In addition, Gardner has moved to strike certain affidavits filed by Defendants and has asked the Court to take judicial notice of certain other affidavits (Docs. 35, 37).

---

[1] ERISA permits suits to recover benefits only against the plan as an entity. Neuma, Inc. v. AMP, Inc., 259 F.3d 864, 872 n.4 (7th Cir. 2001).  Accordingly, the Plans are the named defendants in this action.

For the reasons that follow, the motion to strike and the request for judicial notice are ALLOWED to the extent provided herein. The motions for summary judgment are DENIED.

## BACKGROUND

Gardner worked for Illinois Bell Telephone Company (hereinafter "AT&T") as a Marketing Support Specialist from February 12, 2001 until she requested medical leave on March 13, 2006.[2]  (Defs.' UMF ¶ 3).  As a Marketing Support Specialist, Gardner's job duties were sedentary in nature and consisted primarily of communicating with customers via telephone and coordinating the provision of various user-related services.  (Defs.' UMF ¶ 4; Pl.'s SJ Mem. at p. 13).  As an AT&T employee with over six months of employment with the company, Gardner was enrolled in the Ameritech Sickness & Accident Disability Benefit Plan (the company's short-term disability benefit plan, or "SADB Plan") and the Ameritech Long Term Disability Plan ("LTD Plan").  (Defs.' UMF ¶ 5; R-0043).[3]

### The Plans

Under the SADB Plan, an eligible employee is entitled to benefits "on account of  Disability."  (SADB Plan, Section 3.1(a), R-0008.  The term "Disability" is defined, in part, as follows:

> [A] sickness or injury, supported by objective medical documentation, that prevents the Eligible Employee from performing the duties of

---

[2] According to Defendants, Illinois Bell and Ameritech are now subsidiaries of AT&T, Inc.  (Defs.' Resp. to Pl.'s Mot. to Strike at p. 3 n.1).  For purposes of simplicity, AT&T subsidiaries will be referred to generally as AT&T except as otherwise indicated (i.e. where a distinction is necessary or helpful).

[3] Citations to R__ are references to the "administrative record" compilation of documents that Defendants filed on July 23, 2008 (Doc. 17).

his/her last Company or Participating Company-assigned job with or
without reasonable accommodation (as determined by the Company or
its delegate) or any other job assigned by the Company or Participating
Company for which the Eligible Employee is qualified with or without
reasonable accommodation (as determined by the Company or its
delegate).

(SADB Plan, Section 2.4, R-0007).  If the Disability is due to an off-the-job illness or

injury, benefits under the SADB Plan begin after a seven-day "Waiting Period" and

continue for up to 52 weeks.  (SADB Plan, Sections 2.4 & 3.1, R-0007-08).  The LTD

Plan provides for benefits if the employee is still disabled, due to an off-the-job

illness or injury, after the employee has exhausted SADB Plan benefits.[4]

Under the terms of the Plans, the "Company" (defined by the Plans as

"Ameritech Corporation") is designated Plan Administrator and the Company is

directed to appoint the "Committee" to handle the administrative responsibilities

associated with the Plans.  (SADB Plan, Section 6.1, R-0021; LTD Plan, Section 5.1,

R-0031).  The term "Committee" is defined as follows:

[T]he Ameritech Employees' Benefit Committee.  "Committee" shall
also mean, where appropriate, any applicable subcommittee or any
duly authorized delegate of the Company, a Participating Company or
the Committee as the case may be.  Such duly authorized delegate may
be an individual or organization within the Company, the Participating
Company or the Committee or may be an unrelated third party
individual or organization.

(SADB Plan, Section 2.2, R-0007; LTD Plan, Section 2.2, R-0027).  The Plans

designate both the Company and the Committee as named fiduciaries for purposes

of ERISA.  (SADB Plan, Section 6.1, R-0021; LTD Plan, Section 5.1, R-0031).

---

[4] The LTD Plan's definition of "Disability" differs from the SADB Plan's definition of
that term and also differs depending on whether the employee is salaried or non-
salaried.  (LTD Plan, Section 2.4 and Appendices A & B thereto).  In all cases, and
in both Plans, a "Disability" designation requires "objective medical
documentation."

The Plans direct the Committee to "grant or deny claims for benefits . . . and authorize benefit payments."  (SADB Plan, Section 6.2(d), R-0021; LTD Plan, Section 5.2(d), R-0031).  In addition, the Plans designate the Committee as "the final review committee, under the Plan[s] and ERISA, for the review of all appeals by individuals whose initial claims for benefits have been denied, in whole or part." (SADB Plan, Section 6.2(e), R-0022; LTD Plan, Section 5.2(e)).  The Plans also contain the following provisions:

> The Committee has full discretionary authority to interpret the terms of the Plan[s] and to determine eligibility for and entitlement to Plan benefits in accordance with Plan terms.  The Committee shall determine conclusively for all parties all questions arising in the administration of the Plan[s] and any decision of the Committee shall not be subject to further review.

> The Company may allocate responsibilities for the operation and administration of the Plan[s] consistent with . . . Plan[ ] terms.  The Company and other named fiduciaries may delegate any of their responsibilities hereunder by designating in writing other persons to carry out their respective responsibilities under the Plan[s], and may employ persons to advise them with regard to any such responsibilities. Any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan[s].

(SADB Plan, Section 6.2(f)-(g), R-0022; LTD Plan, Section 5.2(f)-(g), R-0032).

## Delegation of Claims Administration Authority

On July 2, 2008, Defendants submitted a declaration by Nancy Watts, a senior benefits analyst at AT&T Services, Inc.  In the declaration, dated June 30, 2008, Watts attested to "managing, for litigation purposes, the administrators of the ERISA-governed disability plans of subsidiaries of AT&T and providing subject matter expertise, again for litigation purposes[,] on those disability plans, including the Ameritech Long Term Disability Plan . . . and the Ameritech Sickness and

4

Accident Disability Plan . . . ."  (Doc. 11, 6/30/2008 N. Watts Decl. ¶ 2).  After

restating certain Plan provisions relating to Plan administrative structure, Watts

stated,

> Effective November 8, 2000, the Company appointed the SBC Quality Review
> Unit ("the Unit"), as the Appeal Administrator for the Plans.  A true and
> correct copy of the Summary of Material Modifications issued on or about
> November 8, 2000 informing Plan participants of this appointment is
> attached hereto as Exhibit A.  In 2001, the name of the Unit was changed to
> the SBC Medical Absence and Accommodation Resource Team ("SMAART")
> Quality Review Unit and effective March 1, 2006, the name of the Unit was
> changed to the AT&T Integrated Disability Service Center Quality Review
> Unit, which is its current name.

(6/30/2008 N. Watts Decl. ¶ 6).  No exhibits were attached to the declaration.  Watts

concluded by asserting, "The Unit, therefore, has the same authority and discretion

as the Committee to interpret the terms of the Plans and to determine eligibility for

benefits pursuant to the Plans' terms."  (6/30/2008 N. Watts Decl. ¶ 7).  On

December 22, 2008, Defendants filed a document which, ostensibly, was the

document that Watts referred to as Exhibit A in her June 30, 2008 declaration.  The

document purports to be a "Summary of Material Modifications" ("SMM") to the

SADB and LTD Plans, notifying Plan participants that as of November 8, 2000, the

SBC Quality Review Unit would be appointed as Appeals Administrator for the

Plans.  (Doc. 24, 11/8/2000 SMM).[5]

   On January 29, 2009, as part of the briefing on summary judgment,

Defendants filed a "Supplemental Affidavit of Nancy Watts," dated January 19,

2009.  (Doc. 30, Ex. A to Defs.' Mem. in Opp. to Pl.'s SJ Mot., 1/19/2009 N. Watts

---

[5] In responding to Gardner's summary judgment motion, Defendants indicated that
Watts' declaration was inadvertently filed without the SMM attached as Exhibit A.
(Defs.' Resp. to Pl.'s SJ Mot. at pp. 20-21).

Supp. Decl.).  The supplement was apparently designed to clarify the delegation of claims-administration authority under the Plans.  Watts identified AT&T Integrated Disability Service Center Quality Review Unit (the Plans' most recent appeals administrator, according to the record) as being a division of Sedgwick Claims Management Services, Inc. -- an independent company outside the AT&T corporate umbrella.  According to Watts, Sedgwick was appointed on April 9, 2001 to decide benefit claims under the Plans and has served as claims administrator since that date.  (1/19/2009 N. Watts Supp. Decl. ¶¶ 7-13).  And, according to Watts, immediately before Sedgwick was appointed as the Plans' claims administrator, the Human Resources Department of SBC Communications, Inc. had been serving in that capacity for some time.  (1/19/2009 N. Watts Supp. Decl. ¶¶ 7-8).  As will be discussed more fully below, Gardner has moved to strike both of Watts' affidavits.

### Documentation of Gardner's Medical Condition

Gardner began experiencing an aching-type back pain in early March 2006 when standing up from a seated position.  The pain quickly worsened and became more acute.  (Defs.' UMF ¶¶ 11-12).  On March 13, 2006, Gardner visited the emergency room at Proctor Hospital in Peoria, Illinois due to the back pain.  She was admitted to the hospital, prescribed morphine sulphate for the pain, and referred to Bruce Chien, M.D.  Dr. Chien is board certified in anesthesiology, internal medicine, and pain medicine.  (Pl.'s SOF ¶ 16; R-0295).  An MRI of Garnder's lumbar spine, taken on March 14, 2006, revealed "[d]egenerative disc disease evident by mild degenerative dehydration and loss of disc space height of the L3-L4, L4-L5, and L5-S1 discs . . . . associated with . . . posterior central annular

tears of the L3-L4, and L5-L5 discs." (Pl.'s SOF ¶ 17; R-0291).  She was given a midline L4 epidural steroid injection on March 15, 2006, which she tolerated well and which alleviated her pain to some degree.  (R-0299).  A March 23, 2006 MRI of Gardner's cervical spine showed no abnormalities except for mild annular bulges of the C3-C4, C4-C5, and C5-C6 discs.  (R-0300).

Dr. Chien referred Gardner to Richard Flores, M.D., with the Central Illinois Rehabilitation Associates, for Neurosensory testing and Electronueromyography ("EMG").  In examining Gardner on April 3, 2006, Dr. Flores observed "[l]umbar nerve root lesion, [c]ubital tunnel syndrome, and [p]eripheral neuropathy." (R-0304).  Neurosensory testing of Gardner's upper and lower extremities showed "moderate to severe bilateral sensory polyneuropathy with beginning axonal loss, especially in the lower extremities." (R-0306).  EMG of the upper and lower extremities showed "[b]ilateral mild to moderate denervation in the ulnar nerve distribution from the elbows distally bilaterally" and "[m]ild bilateral L4 radiculopathies." (R-0306).  Grip and pinch testing revealed reduction in Gardner's grip strength.  (R-0306).

On April 17, 2006, Dr. Chien performed another midline L4 epidural steroid injection on Gardner.  (R-0358).  The preoperative and postoperative diagnosis was "[b]ilateral L4 radiculopathy" and "left C7 radiculopathy." (R-0358).

On April 20, 2006, Gardner underwent a CT scan of her lumbosacral spine with an injection of contrast at the L4-L5 disc.  The scan showed "evidence of disruption of the L4-L5 disc annulus posteriorly with extension of contrast to the posterior annulus near the midline into the epidural space and also to the left along

the left." (R-0377). A discogram examination at the L4-L5 level, also performed on April 20, 2006, revealed "[c]oncordant 7 out of 10 pain demonstrated with injection of the L4-L5 disc space" and "significantly diminished disc tugor at this level and evidence of penetration of contrast into, if not through, the annular region posteriorly." (R-0379).

On May 3, 2006, Dr. Chien wrote a letter to Lou'litha Walls, employed with the AT&T Integrated Disability Service Center ("IDSC"), which stated as follows: "Ms. Gardner has a ruptured L4 disc by discography and bilateral lumbar radiculopathy (L4). At the current time she cannot stand or sit for any period more than about 3 minutes. She is completely disabled from all work at the current time. She is waiting to see Dr. Dzung Dinh, who is our L4 disc replacement vs. fusion Neurosurgeon."[6] (R-0375).

After examining Gardner on or about June 16, 2006, Dzung Dinh, M.D., wrote a letter to John Miller, M.D. -- Gardner's primary care physician -- which confirmed a L4-L5 annular tear, a discogram that was positive at the L4-L5 level, bilateral mild to moderate denervation of the ulnar nerve of the bilateral elbows distally, and mild bilateral L4 radiculpathies in the lower extremities. (R-0398). Dr. Dinh recommended that Gardner continue the pain regimen as prescribed by Dr. Chien, including the following pain medications: Lyrica, Nabumetone, Tramadol, and hydrocodone. Dr. Dinh also recommended a course of water therapy. (R-0397-98).

---

[6] Presumably, Dr. Chien was writing to IDSC to provide medical documentation of Gardner's medical condition in accordance with SADB Plan, Section 5.7 (R-0016).

On July 24, 2006, Dr. Chien performed an L4-L5 intradiscal block and discography on Gardner and referred her again to Dr. Dinh for a follow-up appointment.  On August 4, 2006, Dr. Dinh wrote Gardner's primary care physician,

> I had the pleasure of seeing Melissa Gardner for a follow up today regarding her chronic back pain.  Her pain is constant and rated 9/10 with some improvement while in the water.  The pain returns after 30 minutes of being out of the pool therapy.  Currently she is taking Vicodin ES, Relafen, Lyrica, and Tramadol.  She had an intradiscal block by Dr. Chien on July 24 with pain relief for 15 minutes after L4-5 block.  At this point it appears that her pain may be coming from the L4-5 disc space however her insurance company will not approve artificial disc replacement surgery at this point.  We are a clinical trial center for Aesculap lumbar artificial disc trial starting next year.  In the meantime I will contact Dr. Chien to see if he can provide her some interim pain management with either a DCS (Dorsal Column Stimulator) trial or intrathecal pain pump.

(R-0454) (parenthetical added).

On August 9, 2006, Dr. Chien wrote a letter to Robin Hamilton (employed by IDSC) and stated as follows: "My understanding of Melissa Garner's disability centers on the need for disc replacement.  The underlying condition will NOT change in a year, a month or a week.  Two week visits are completely abusive and unnecessary to confirm disability."[7]  (R-0448) (capitalization in original).  On August 24, 2006, Dr. Chien wrote Dr. Miller:

> Melissa Gardner was in the office for a re-evaluation.  Her situation is unchanged; she has a known freely repuctured L4 disc noted at L45 discogram 4/230/06 [sic], and noted by myself fluoroscopically on diagnostic L5 and then L4 disc injnection.  She hasn't improved much at all.  Walking is limited to about 100 feet (from the car to the parking lot).  She sleeps on her side, drives about 15 minutes and at that point has pain paraspinally on the left . . . . Impression: Unchanged.  She's disabled L4 discogenic pain (left paraspinal) L5 discogenic pain (left

---

[7] Dr. Chien's reference to physician visits every two weeks was apparently directed at IDSC's requests for periodic updates as to the status of Gardner's medical condition.  (R-0016, 0449).

buttock).  I've spent a good bit of time discussing why we don't' [sic] want to do a spinal pump implant as a "temporary" maneuver, and that the DCS is not appropriate for her distribution of pain.  Chronic maintenance narcotics only will lead to escalation.  She understands this and is complying with two Vicodins perday, awaiting the clinical realease [sic] of the Charite disc.

(R-0457).

On September 7, 2006, Dr. Chien again wrote to IDSC's Lou'litha Walls and

stated,

Melissa Gardner is disabled from work.  She has an open L45 disc demonstrated at 4/25/06 discogram and has concordant history and symptoms.  She should NOT work until she has found surgical intervention.  Our local surgical community, now having experienced Phase II clinical trials of the Charite disc. [sic] Feels strongly that she should wait for the release of this product.  The distribution of her pain is not conducive to Dorsal Column Stimulator suppression.  Although she could be fused, I have to defer to our surgical opinion.  She cannot sit or stand for any period of more than about 3 minutes, which is hardly compatible with the workplace.

(R-0466) (capitalization in original).  On January 30, 2007, Dr. Chien wrote a letter

to IDSC that was virtually identical to the September 7, 2006 letter, adding that

Gardner "is unable to arise even from a chair without a 25 pound hand assist.  She

has to roll to erect from bed."  (R-0427).

### Gardner's Description of the Effects of Her Medical Condition

Included in the record is a declaration by Gardner in which she states as

follows:

I have constant pain in my middle and lower back, radiating down my entire left hip, leg, calf and foot. [sic] Where I suffer numbness in the toes of my left foot.  I have almost constant headaches and returning migranes from the pain in my neck and shoulder area.  I have experienced a loss in my appetite from the pain and medications.  I'm almost always tired and moody.  I also suffer from short term memory loss due to the amount of medication I am on.

. . .

In a typical day this is what I do: Wake up in pain, get out of bed, go to
the kitchen (next room) take medication, go lay down in recliner in
living room (next room) with bowl of cereal, where I lay still for at least
a couple of hours until the medicine has time to ease some of my pain.
I continue to stay in the recliner until lunch, where I then go back to
kitchen and get something for lunch, maybe help my boys with theirs if
they need it, and return to my recliner until dinner time.  Then I sit at
our kitchen table long enough to eat dinner with my family and then
return to the recliner until bed time.  I then either, take a shower or
bath, and then take my medication and go to bed with heating pad
around my back.

I cannot work because: The pain and discomfort I have almost 100% of
the day and night would not, and does not allow me to function
normally.  The medication I have to take in order to not be in
excruciating pain makes me unable to drive, work, and function on my
own.  I greatly depend on my two children (ages 7 & 13 years) to help
on a day to day basis, because I am unable to do for myself.  Other than
doctors appointments, and occasionally going somewhere with my
family I rarely leave my home.

(7/18/2007 M. Gardner Decl. ¶¶ 6, 9, 10; R-0547-48).  According to her declaration,

Gardner takes the following medications: Nabumetone (500 mg tab, twice daily);

Carisoprodol (350 mg tab, 4 times daily); Tramadol (50 mg tab, 4 times daily);

Hydrocodone (500 mg tab, every 6 hours); Ambien (10 mg tab, at bedtime); Imitrex

(6 mg injection, every two hours as needed).  (7/18/2007 M. Gardner Decl. ¶ 7).

**Plan-Related Evaluations and Benefit Denial**

On March 20, 2006, Gardner was approved for and began receiving short-

term disability benefits under the SADB Plan on account of her back condition.

(Defs.' UMF ¶ 14).  Her disability benefits were extended numerous times through

January 18, 2007.  (Defs.' UMF ¶ 18; Pl.'s SOF ¶ 3).

Meanwhile, on September 1, 2006, Sankar Pemmaraju, D.O., a board

certified physician in physical medicine and rehabilitation who was retained by the

SADB Plan, reviewed Gardner's medical file.  He took note of her April 2006 discogram which revealed an L4 disc rupture but ultimately concluded, "[w]hile the patient may have had some problems with chronic low back pain/discogenic pain, there is no indication from the available clinical documentation/information of any significant or severe positive objective findings or significant/severe functional limitations occurring that would have prevented a return back to her sedentary work activity by 9/6/06."  (R-0137).  Dr. Pemmaraju characterized Gardner's complaints of disabling pain as "subjective."  He suggested that Gardner's back condition was not severe and that regular exercise along with periodic, as-needed medical treatment were sufficient to keep her in good enough health to continue sedentary work.  (R-0137).  Dr. Pemmaraju indicated that no work restrictions were necessary, although he seemed to recommend that Gardner be permitted to frequently change positions upon return to work.  (R-0138).

On September 6, 2006, an agent of IDSC contacted Gardner and informed her that her SADB Plan benefits were being terminated on account of Dr. Pemmaraju's conclusions.  (R-0139-40).  The next day, IDSC received Dr. Chien's letter (dated September 7, 2006 and set out above) stating that Gardner remained totally disabled from work and should not return to work until after appropriate surgical intervention.  (R-0140-41).  Upon receiving Dr. Chien's letter, IDSC decided to delay the denial of Gardner's benefits pending an Independent Medical Examination ("IME").  (R-0141).

Steven C. Delheimer, M.D., a neurosurgeon, performed the IME on January 8, 2007 at his office in Bloomington, Illinois.  In the course of the IME, Dr.

Delheimer obtained a narrative medical history from Gardner, performed a neurologic exam on her, and reviewed medical records and diagnostic films/studies pertaining to her lumbar spinal condition.  He concluded that Gardner had degenerative disc disease of her lumbar spine which accounted for the annular tear at the L4-L5 disc.  Dr. Delheimer described Gardner's prognosis as "guarded" and noted, "this current episode has remained refractory to significant attempts at conservative treatment."  He went on, "Although Ms. Gardner has failed to respond to conservative treatment, I am reluctant to recommend any type of surgical intervention given the nature of the changes on her MRI."  (R-0423).  Dr. Delheimer indicated that Gardner's treatment and workup had been reasonably undertaken.  Referencing the Charite disc replacement that Dr. Chien had recommended, Dr. Delheimer stated, "the chances of improvement are reported to be 57%, which is no better than the natural history of the [degenerative disc] disease itself."  (R-0423).  He suggested alternative treatments such as anterior lumbar fusion or a posterior hemilaminotomy.  (R-0423).

Dr. Delheimer noted that Gardner was taking a combination of Lyrica, Tramadol, Nabumetone, and Hydrocodone to control her pain.  He reported Gardner's representation that without these medications, her pain level was at a "10 to 15" rating on a scale of 0 (no pain) to 10 (the worst imaginable pain) and with the medication, her pain decreased to a 5 or 6 rating.  (R-0423).

Ultimately, Dr. Delheimer concluded that Gardner's medical condition "should not prevent her from working given the sedentary nature of the job."  (R-0424).  He qualified that conclusion, however, by indicating that the following

13

factors could indirectly interfere with her return to work: her regimen of pain medications; the prolonged drive to and from work every day (from East Peoria to Springfield, Illinois and back); the fact that standing and walking exacerbate her pain; and the fact that the only pain-alleviating position for her is lying down. Although Dr. Delheimer specified no work restrictions applicable to Gardner, he did suggest that she should change positions as needed for purposes of comfort. (R-0424).

Based on Dr. Delheimer's IME report, an agent of IDSC contacted Gardner and informed her that she was not disabled under the terms of the SADB Plan and could return to work. (Defs.' UMF ¶ 38). Gardner indicated to the IDSC agent that she would not return to work, reiterating Dr. Chien's conclusion that she needed a disc replacement procedure (Charite disc replacement) that was not yet available because the FDA was a year or more away from approving it. (Defs.' UMF ¶ 39). On January 19, 2007, IDSC terminated Gardner's short-term disability benefits under the SADB Plan. (Defs.' UMF ¶ 41).

On the same day, January 19, 2007, Gardner appealed the termination of her short-term disability benefits. (Defs.' UMF ¶ 42). Subsequently, IDSC's Quality Review Unit ("IDSCQRU") reviewed Gardner's appeal and requested that two independent physicians review her medical records and opine on her ability to work. (Defs.' UMF ¶ 43).

Philip Jordan Marion, M.D., who is board certified in physical medicine/rehabilitation and pain management, was the first physician to review the relevant medical records (including Dr. Chien's letters and Dr. Delheimer's report)

14

for purposes of Gardner's appeal.  Dr. Marion confirmed the prior findings of

degenerative disc disease with central annular tears at L3-4 and L4-5; however, he

remarked that there was no evidence of herniated disc disease or nerve root

impingement.  Dr. Marion found Gardner's bilateral L4 radiculopathies to be mild.

He opined, from a pain management perspective, that Gardner's lumbar spinal

condition did not preclude her from performing sedentary work.  (R-0212).

Specifically, he reported,

> The clinical findings consist primarily [of] the patient's complaints of
> low back pain with poor sitting and standing tolerance.  However, this
> is not associated with significant underlying objective radiological
> (lumbar MRI) findings or electrodiagnostic findings correlating to the
> patient's severe subjective complaints . . . . The patient's clinical
> findings are significant; however, they are not associated with objective
> impairment precluding her from performing the routine duties of her
> regular job.

(R-0211).  However, Dr. Marion cautioned that "if indeed the patient requires

surgical intervention and has significant pathology from a neurosurgical

perspective, this is best addressed by the neurosurgeon and this physician advisor

would defer to the neurosurgeon regarding surgical intervention and the patient's

disability status."  (R-0212).

J. Parker Mickle, M.D., who is board certified in neurosurgery, also reviewed

Gardner's relevant medical records for purposes of her disability benefit appeal.  He

found no significant clinical findings except for the following: Gardner's complaints

of pain; minimal degenerative disease in the cervical and lumbar spines; and mild

neurodiagnostic electrical studies demonstrating a "questionable" diagnosis of

polyneuropathy.  Dr. Mickle opined that Gardner's most significant problems were

obesity and "chronic pain syndrome."  (R-0215).  He could find no clear-cut

15

explanation for her complaints of pain.  (R-0213).  Dr. Mickle concluded that

Gardner was not disabled and stated that the medical evidence showed no physical

impairment that would prevent her from performing her usual occupation.  (R-

0214).  He did not recommend any physical work-related restrictions.  (R-0215).

On September 14, 2007, IDSCQRU denied Gardner's appeal after concluding

that the medical documentation of Gardner's spinal condition did not support a

determination that the condition was severe enough to constitute a disability under

the terms of the SADB Plan.  (R-0245-46).  Because Gardner's short-term disability

benefits were terminated prior to the completion of a 52-week waiting period

provided for in the LTD Plan, IDSCQRU also decided that Gardner was not entitled

to long-term disability benefits.  (Defs.' UMF ¶¶ 49-56).  This civil action followed,

and the parties have cross-filed for summary judgment.

## STANDARD OF REVIEW

The standard of judicial review in suits challenging the denial of benefits,

under 29 U.S.C § 1132(a)(1)(B), depends upon the discretion given to the benefit

plan's administrator or fiduciary.  Semien v. Life Ins. Co. of N. Am., 436 F.3d 805,

810 (7th Cir. 2006).  The denial of benefits is reviewed de novo "unless the benefit

plan gives the administrator or fiduciary discretionary authority to determine

eligibility for benefits or to construe the terms of the plan."  Firestone Tire &

Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  Generally, if the plan gives its

administrator or fiduciary discretionary authority to construe the plan's terms, the

district court must review the denial of benefits under the deferential "arbitrary and

capricious" standard.  Hess v. Reg-Ellen Machine Tool Corp. Employee Stock

Ownership Plan, 502 F.3d 725, 727 (7th Cir. 2007).  A denial of benefits is arbitrary and capricious only if it is "downright unreasonable."  Id.  The party seeking deferential review has the burden of proof on the issue.  Sperandeo v. Lorillard Tobacco Co., Inc., 460 F.3d 866, 870 (7th Cir. 2006); see also Sharkey v. Ultramar Energy Ltd., Lasmo plc, Lasmo (AUL Ltd.), 70 F.3d 226, 230 (2d Cir. 1995).

In the present case, the Plans name the "Committee" as a fiduciary and assign the Plans' administration to the Committee.  (SADB Plan, Section 6.1, R-0021; LTD Plan, Section 5.1, R-0031).  Further, the Plans grant the Committee "full discretionary authority to interpret the terms of the Plan[s] and to determine eligibility for and entitlement to Plan benefits in accordance with Plan terms." (SADB Plan, Section 6.2(f), R-0022; LTD Plan, Section 5.2(f), R-0032).  Gardner concedes (by not disputing) that this language would be sufficient to trigger deferential review of a decision made by the Committee.

Gardner argues, however, that the Committee's discretionary authority was not properly granted or delegated to IDSCQRU -- the entity that actually denied her claim for benefits.  Therefore, she contends, the arbitrary and capricious standard of review is not warranted.  Gardner relies upon out-of-circuit decisions as persuasive authority to carry her argument.[8]

In McKeehan v. CIGNA Life Ins. Co., the Court of Appeals for the Eighth Circuit reversed a district court's decision to review the denial of benefits by a third-

---

[8] No party has offered, and this Court has not located, any decision by the Court of Appeals for the Seventh Circuit squarely addressing the validity of an argument akin to Gardner's.  The Court of Appeals mentioned, but declined to address, a similar argument in Semien v. Life Ins. Co. of N. Am., 436 F.3d 805, 811 (7th Cir. 2006).

party claims administrator under the arbitrary and capricious standard.  344 F.3d 789 (8th Cir. 2003).  Although the court of appeals agreed that the deferential standard was triggered by language in the benefit plan granting discretionary authority to the plan's sponsor, the court found no evidence that the sponsor explicitly or properly delegated its discretionary authority to the third-party administrator when it outsourced claims-servicing responsibilities to the administrator.  Id. at 792-93.  Accordingly, the court of appeals held that the district court erred by failing to review the benefit denial under a de novo standard.  Id. at 793.

The Court of Appeals for the First Circuit reached a similar conclusion in Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580 (1st Cir. 1983).  In Rodriguez-Abreu, the benefit plan expressly granted named fiduciaries and their delegates the discretionary authority to interpret the meaning of plan provisions and to make determinations regarding questions of fact associated with benefit entitlements.  986 F.2d at 584.  Nevertheless, the court of appeals affirmed the district court's decision to review de novo the plan administrator's denial of benefits to a former employee.  The court of appeals concluded that arbitrary and capricious review was unavailable due to the lack of evidence that the plan administrator was acting as a delegate of the plan's named fiduciaries.  The court of appeals refused to rely on "inferences from the circumstances" -- such as the fact that the plan administrator had answered the employee's final request for administrative review of the benefit denial -- to establish that the administrator had been delegated the

discretionary authority to interpret the plan's terms.  The court suggested that more concrete evidence was necessary to invoke arbitrary and capricious review.  Id.

McKeehan and Rodriguez-Abreu are persuasive under the circumstances present in this case.  Here, the Plans expressly allow "[t]he Company and other named fiduciaries" (which would include the Committee) to "delegate any of their responsibilities . . . by designating in writing other persons to carry out their respective responsibilities under the Plan[s]."[9]  (SADB Plan, Section 6.2(g), R-0022; LTD Plan, Section 5.2(g), R-0032).  Defendants, however, have failed to provide sufficient admissible evidence to establish that IDSCQRU was expressly (and otherwise properly) delegated or granted the discretionary authority reserved for the Committee under the Plans' terms.

Defendants point to Nancy Watts' June 30, 2008 declaration as proof that on November 8, 2000, IDSCQRU (then called SBC Quality Review Unit, according to Watts) was given discretionary authority to determine benefit eligibility and to interpret Plan terms.  (Defs.' SJ Mot. at p. 15).  Gardner has moved to strike the relevant portions of this declaration, along with Watts' January 19, 2009 supplemental declaration, based on evidentiary objections.  In her motion to strike, Gardner contends that Watts' statements are not based on personal knowledge and are hearsay.  Gardner also challenges certain of Watts' statements as being inadmissible legal conclusions.

---

[9] ERISA authorizes named fiduciaries to delegate fiduciary responsibilities (other than trustee responsibilities).  29 U.S.C. § 1105(c)(1).

## Watts' June 30, 2008 Declaration

Rule 56(e)(1) of the Federal Rules of Civil Procedure sets forth requirements for affidavits submitted at the summary judgment stage.[10]

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

Paragraph 1 and 2 of Watts' June 30, 2008 declaration indicate that on June 30, 2008 Watts worked for AT&T Services, Inc. as a senior benefits analyst whose responsibilities included "managing, for litigation purposes, the administrators of the ERISA-governed disability plans of subsidiaries of AT&T and providing subject matter expertise, again for litigation purposes[,] on those disability plans." (6/30/2008 N. Watts Decl. ¶¶ 1-2).  The declaration does not specify the length of Watts' employment as a senior benefits analyst or her length of employment with AT&T Services, Inc.[11]  Paragraph 6 states,

---

[10] Declarations made pursuant to 28 U.S.C. § 1746 are indistinguishable from affidavits for purposes of Rule 56(e).  See Woods v. City of Chicago, 234 F.3d 979, 987 (7th Cir. 2000).

[11] Another declaration by Watts, which was prepared for purposes of a different lawsuit, indicates that she began working as a benefits analyst for AT&T Services, Inc. in June 2004.  (Doc. 37, Ex. 4)  Gardner filed this declaration on February 11, 2009, as part of a submission including other "outside" declarations by Watts, and requested that the Court take judicial notice.  Offering no opinion as to whether the declarations warrant judicial notice as "official court records" (the way Gardner has framed the submission), the Court will consider the submission because Defendants have raised no specific objection to it.  In any event, the submission is not outcome determinative.

> Effective November 8, 2000, the Company appointed the SBC Quality Review Unit (the "Unit"), as the Appeal Administrator for the Plans. A true and correct copy of the Summary of Material Modifications issued on or about November 8, 2000 informing Plan participants of this appointment is attached hereto as Exhibit A. In 2001, the name of the Unit was changed to the SBC Medical Absence and Accommodation Resource Team ("SMAART") Quality Review Unit and effective March 1, 2006, the name of the Unit was changed to the AT&T Integrated Disability Service Center Quality Review Unit, which is its current name.

(6/30/2008 N. Watts Decl. ¶ 6). Paragraph 7 states, "[t]he Unit, therefore, has the same authority and discretion as the Committee to interpret the terms of the Plans and to determine eligibility for benefits pursuant to the Plans' terms." (6/30/2008 N. Watts Decl. ¶ 7).

Paragraph 7 is stricken because it is a legal conclusion by Watts and is therefore inadmissible. Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999) (conclusory statements do not meet the requirements of Fed. R. Civ. P. 56(e)(1)).

Paragraph 6 is stricken because the declaration does not provide a sufficient foundation to satisfy the Court that Watts had personal knowledge of the purported November 8, 2000 appointment of SBC Quality Review Unit (now known as IDSCQRU, according to Watts) as an appeals administrator wielding discretionary benefit-determination authority. Rule 602 of the Federal Rules of Evidence states, "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Although Watts has represented that her declarations are based on "personal knowledge," there is no indication that Watts was personally involved in any decision to appoint SBC Quality Review Unit as a Plan administrator empowered with the Committee's discretionary authority to make benefit determinations. Defendants suggest that

Watts acquired her knowledge of the purported appointment through a review of corporate records (Defs.' Resp. to Pl.'s Mot. to Strike, at pp. 4-6), but there is no statement to that effect in Watts' initial or supplemental declarations.

In Paragraph 6, Watts refers to an "Exhibit A" and describes the exhibit as a "Summary of Material Modifications" issued on or about November 8, 2000 ("11/8/2000 SMM") notifying Plan participants that SBC Quality Review Unit was the new appeals administrator. But there was no exhibit attached to Watts' June 30, 2008 declaration. (See Doc. 11, filed on 7/2/2008). Apparently, Defendants noticed this error and attempted to correct it on December 22, 2008 by filing what purports to be Exhibit A -- the 11/8/2000 SMM -- as a stand-alone document. (Doc. 24). The Court refuses to consider the 11/8/2000 SMM for a few reasons. First, it was not attached to or served with Watts' June 30, 2008 declaration as Fed. R. Civ. P. 56(e)(1) requires.[12] Second, Watts' declaration does not lay a sufficient foundation to authenticate the document under the Federal Rules of Evidence. Third, the 11/8/2000 SMM qualifies as hearsay, and Defendants have failed to identify any applicable exception to the hearsay rule. The document is therefore inadmissible for purposes of summary judgment. See Woods v. City of Chicago, 234 F.3d 979, 987-88 (7th Cir. 2000) (documentary evidence submitted in support of a motion for summary judgment must be properly authenticated and otherwise admissible).

---

[12] Fed. R. Civ. P. 56(e)(1) provides, in relevant part, "If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit." (emphasis added).

**Watts' January 19, 2009 Supplemental Declaration**

The Court will not accept any portion of Watts' January 19, 2009 supplemental declaration as evidence that IDSCQRU was acting under the Committee's discretionary benefit-determination authority when the entity denied disability benefits to Gardner.  Watts' supplemental declaration provides no more foundation than her June 30, 2008 declaration as to how she became familiar with a purported grant of discretionary authority to IDSCQRU.[13]  For purposes of summary judgment, Defendants have failed to convince the Court that Watts is competent to testify to any grant or delegation of discretionary authority to IDSCQRU in connection with benefit determination or Plan interpretation.

**Applicable Standard of Review**

In sum, there is insufficient admissible evidence on record to establish that IDSCQRU was acting pursuant to the Committee's discretionary benefit-determination authority when it denied disability benefits to Gardner.  Therefore, the standard of review is de novo.

---

[13] Watts' January 19, 2009 supplemental declaration does not mesh well with her initial June 30, 2008 declaration.  For example, the supplemental declaration states that IDSCQRU is a division of Sedgwick Claims Management Services, Inc. and that Sedgwick was appointed as the Plans' claims administrator (with discretionary authority) on April 9, 2001.  (1/19/2009 N. Watts Supp. Decl. ¶¶ 7-11).  The initial declaration, however, seems to indicate that IDSCQRU is the same entity as SBC Quality Review Unit -- the unit appointed as the Plans' appeals administrator (with discretionary authority) on November 8, 2000.  (6/30/2008 N. Watts Decl. ¶ 6).  It is not easy to harmonize these statements without more detailed or better organized information.  Watts' failure to present the information in an organized, readily understandable fashion certainly does not help Defendants.

## DISCUSSION

The parties have cross-filed motions for summary judgment pursuant to Fed. R. Civ. P. 56. Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). At the summary judgment stage, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

There is a glaring issue of material fact as to whether Gardner was under a "Disability" under the terms of the SADB Plan when her short-term disability benefits were terminated. On one hand, there is evidence from Gardner's treating physician, Dr. Chien, and from other medical records, indicating that Gardner was physically unable to work due to her spinal condition. On the other hand, there is evidence from various other physicians indicating that Gardner's spinal condition did not preclude her from performing her sedentary job at AT&T. Because an issue of material fact exists, the parties' motions for summary judgment will be denied.

Earlier in this litigation, the parties suggested that this case could be resolved by a trial on a stipulated record (a.k.a. "trial on the papers") in the event the Court decided against granting summary judgment. (Doc. 8, 5/2/2008 Jt. Sched. Conf. Stmt., at pp. 11-12). Gardner built upon the suggestion by requesting judgment in her favor pursuant to Fed. R. Civ. P. 52 ("Rule 52") as an alternative to

summary judgment under Fed. R. Civ. P. 56.[14]  Indeed, under certain

circumstances, a disposition under Rule 52(a) is a sensible way for a court to resolve

a case where the parties have cross-filed for summary judgment.  See May v.

Evansville-Vanderburgh School Corp., 787 F.2d 1105, 1115 (7th Cir. 1986); see also

Cook Inc. v. Boston Scientific Corp., 333 F.3d 737, 741-42 (7th Cir. 2003); Marshall

v. Blue Cross Blue Shield Ass'n, 2006 WL 2661039, at *1 (N.D. Ill. Sept. 13, 2006)

(collecting cases in the ERISA context).  However, the mere cross-filing of summary

judgment motions does not automatically give a court the green light to decide an

issue of triable fact.  Miller v. LeSea Broad., Inc., 87 F.3d 224, 230 (7th Cir. 1996).

As a general rule, the conversion of cross-motions for summary judgment into a

summary bench trial on the papers is appropriate only when the parties have so

stipulated.  See Lac Courte Oreilles Band of Lake Superior Chippewa Indians v.

Voigt, 700 F.2d 341, 349 (7th Cir. 1983); see also Acuff-Rose Music, Inc. v. Jostens,

Inc., 155 F.3d 140, 142-43 (2d Cir. 1998).

    After reviewing the record, the Court is not convinced that the parties have

expressly and unequivocally stipulated to a trial on the record compiled at the

summary judgment stage.  Defendants never directly addressed Gardner's motion

for judgment pursuant to Rule 52 and did not otherwise reference Rule 52 in the

briefing on summary judgment.  Moreover, during preliminary conferencing, the

parties expressed competing positions as to the scope of discovery and the proper

---

[14] Fed. R. Civ. P. 52(a) provides, in part, "In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."

content of the administrative record.[15]  (5/2/2008 Jt. Sched. Conf. Stmt. at pp. 5-11; 7/2/2008 Supp. Jt. Sched. Conf. Stmt. at pp. 1-3).

The scope of discovery in this case hinges on the applicable standard of review.  When arbitrary and capricious review applies, the court's review is limited to information that was submitted to the plan's administrator; but when de novo review applies, the parties may take discovery beyond the administrative record and present new evidence.  Krolnik v. Prudential Ins. Co. of Am., 570 F.3d 841, 843 (7th Cir. 2009); see also Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan, 195 F.3d 975, 981-82 (7th Cir. 1999).  On July 22, 2008, Magistrate Judge Byron Cudmore issued an Order limiting discovery to the administrative record but leaving open the possibility of expanding discovery at a later date if the Court determined that de novo review applied.  (Doc. 15, 7/22/2008 Opinion and Scheduling Order).  Today, the Court has decided that de novo review applies.  This ruling may affect the parties' litigation strategies.  Accordingly, Gardner's motion for judgment pursuant to Rule 52 will be denied as premature.

## CONCLUSION

Gardner's motion to strike and her request for judicial notice (Docs. 35, 37) are ALLOWED to the extent provided herein.  The cross-motions for summary judgment and Gardner's alternative motion for judgment pursuant to Rule 52 (Docs. 19, 25) are DENIED.  This case is referred to Magistrate Judge Cudmore for further

---

[15] So far as the Court can tell, the dispute over the precise content of the administrative record was never conclusively resolved.  However, at least for purposes of summary judgment, the parties have waived any objections to the documents contained in the "administrative record" compilation filed on July 23, 2008 (Doc. 17).

proceedings related to pretrial matters including discovery and scheduling.  The parties are invited to stipulate to a summary bench trial on a stipulated record.

ENTERED this <u>29th</u> day of September, 2009.

s/ Joe B. McDade
_____
JOE BILLY McDADE
United States District Judge
